DAVID BINKLEY ET AL. V. THE STATE OF NEBRASKA.

[FILED JUNE 11, 1892.]

1. **Criminal Law**: INFORMATION: CHANGING ALLEGED NAME OF ACCUSED. In a prosecution for felony, after the witness had been sworn, the prosecuting attorney asked and obtained leave to make a correction in the name of such witness, by changing the initials of the Christian name from C. A. to H. C. *Held,* That the prosecuting attorney should be required to show that he was not aware of the mistake until that time, and that if the accused should make it appear that he was misled, the court should continue the case to a later day in the term.

2. ———: EVIDENCE. To authorize a jury to find a verdict of guilty in a criminal case the evidence must point to the accused as the party who committed the offense, and mere conjecture or suspicion, however strong, will not warrant a verdict of guilty.

ERROR to the district court for Washington county. Tried below before DOANE, J.

*Jesse T. Davis,* for plaintiffs in error, cited, as to change in information : *Parks v. State,* 20 Neb., 517; *Stricklett v. State,* 31 Id., 674; *Harris v. State,* 24 Id., 803.

*George H. Hastings, contra,* cited, on the same point: *Gandy v. State,* 24 Neb., 723; *Parks v. State,* 20 Id., 515; *Stevens v. State,* 19 Id., 647; *Saxon v. Cain,* Id., 491; *White v. Rourk,* 11 Id., 521; *Van Sant v. Butler,* 19 Id., 354.

MAXWELL, CH. J.

At the adjourned February term of the district court of Washington county the plaintiffs in error were informed against by the county attorney for the offense of an assault with intent to kill and murder one C. A. Alderman, and on the trial were found guilty and sentenced to imprisonment in the penitentiary for one year. The first error as-

signed is in permitting the county attorney to change the name of a witness on the information after such witness had been sworn, from C. A. Alderman to H. C. Alderman. The record upon this point is as follows:

Q. Give your full name.

A. Hercules Campbell Alderman.

The defendant's attorney here objects to the witness testifying, on the ground that the name does not appear on the information.

Q. Who is C. A. Alderman?

A. That is intended for me, but they got the initials wrong.

Q. What is the full name.

A. Hercules C. Alderman.

BY THE COURT. You may amend the name on the information if that is the person intended.

To which the defendants except.

The names of witnesses upon the information should be correctly given. A party accused of crime should be advised in advance of the witnesses who will testify against him, so that he may be prepared to meet their testimony as he may suppose it will be. The reason for this rule is very clearly stated by Judge COBB in *Parks v. State*, 20 Neb., 517, 518, as follows: "It is an innovation which had been often suggested before it was adopted. With its undoubted advantages it has been objected to, as placing too much power in the hands of the prosecutor. Probably foreseeing this objection, the framers of the law sought to throw around the rights of the accused, under this method of prosecution, every reasonable protection. Under the system of prosecution by indictment the grand jury was, in a sense, the accuser of every person brought to trial for a crime. So here, where the services of a grand jury are dispensed with, while the responsibility of the prosecution rests in some sense upon the shoulders of the prosecuting attorney, there is certainly some reason why there should

be open to the accused some source of information as to the identity of the persons upon whose oath his conviction and punishment is about to be claimed at the bar of justice." The prosecuting attorney at least should have been required to show that he had been misinformed as to the name, and that he was not aware of the mistake until that time. Courts cannot be too careful in guarding the rights of the accused in this regard, and where the accused has been misled, and a showing to that effect is made, a continuance to a later day in the term should be granted.

The testimony tends to show that on the 16th of February, 1891, about 6 P. M., the plaintiffs in error, with John Binkley, a brother of the plaintiffs in error, and Alderman were at the depot in the village of Washington; that they had a jug which contained half a gallon of whisky; that they were in the freight department of the depot and each of them was weighed on the scales therein; that each of them drank from the jug; that they tested the strength of each other by two at a time sitting down on the floor of the depot face to face, the feet of one braced against the feet of his associate, and each taking hold of a stick and pulling so as, if possible, to lift his opponent; that after each trial of strength in this manner the jug was called into requisition and each of the four took a drink. This was kept up for some time, probably half an hour or more; by that time the entire party was considerably intoxicated, and Alderman, according to his own testimony, was considerably under the influence of liquor, and according to the testimony of the other witnesses, was drunk. In pulling, the parties had used a broken axe handle on which was a dull axe. The theory of the prosecution is, that the plaintiff in error struck Alderman on the head with the axe and caused the injury which will presently be stated. It also appears that the axe was in the depot; so far as shown belonged there, and was left in the depot; that while the parties were in

the depot they were good natured, and, so far as we can judge, on friendly terms.    Between 6 and 7 P. M., all of parties went out on the platform, and the agent closed the door and fastened it on the inside.    The Binkleys were going to shell corn on the following day and load it on a car, and John Binkley went into the office to speak to the agent.    He was gone but a short time.    When he returned his brothers were gone and he found Alderman a short distance from the depot lying on his face on the ice and snow.    His direct testimony on that point is as follows:

Mr. Ginter and I went out the way I came in; he locked the door and went into his house and I walked around the other way and started for home.

Q. What did you see when you got round to the door that you came out of?

A. I came right around the way I came out of the freight room.

Q. What did you see there when you got around on the platform?

A. I saw Mr. Alderman there; I thought it was one of my brothers when I first saw him.

Q. Where was Alderman at that time?

A. He was lying there on the ice.

Q. About how far from the platform?

A. Well, I should say about three or four feet, or something like that, I could not say positively; I just jumped right over him; jumped right off and jumped right over him.

Q. After you jumped over him what did you do?

A. I picked him up.

Q. Did he have his cap on at that time?

A. No, sir; his cap was lying right by the side of him; I put his cap on his head and picked him up.

Q. Then what did you do with him?

A. I started him for home, to take him over to his home.

Q. Did you see your brothers William or Dan there at the time you first saw Mr. Alderman lying there?

A. No, sir.

Q. Did you see them there about the time Mrs. Alderman came?

A. No, sir; I never noticed them.

Q. How long after you found Mr. Alderman did Mrs. Alderman come?

A. I had just picked him up; I had probably got nearly as far as that gate, then I met her.

Q. Did William or Dan say anything at that time that Mrs. Alderman came up?

A. No, sir; not that I heard of; I never paid any attention to it.

Q. Were they about in sight?

A. No, sir; I didn't notice them at all.

Q. You didn't look for them?

A. No, sir; I just supposed he fell off and got hurt; I was kind of excited about him; I saw he was bleeding; I gathered him up and was taking him home.

Q. How long did you remain after going to Mr. Alderman's place that evening; how long did you remain at Alderman's after taking him home?

A. I think it was about 3 o'clock in the morning.

Q. What time did you go to see him again?

A. I think I went in the morning; I think it was before I had my breakfast; we was in a hurry—getting ready to shell corn.

Q. When you first picked Mr. Alderman up what did he say, if anything?

A. I asked him if he was hurt; he called me some vulgar names, and told me to go to hell.

Q. After you had got him up did you say anything about how he came to get hurt?

A. Yes, sir.

Q. What did he say to you?

A. He told me to go to hell.

Q. Did he ever tell you how it occurred?

A. No, sir.

Objected to. Objection overruled.

Q. At the time, and immediately after he was injured, did he tell you anything about how he was injured?

A. I asked him how he got it done; he told me he didn't know; he said he didn't know how he did get hurt.

Q. State whether or not when you first came to him he was rational or acted rational.

A. Not until I picked him up and asked him if he was hurt. I didn't ask him if he was hurt until I picked him up.

On his redirect examination he testified:

Q. State if you examined, the next morning, the place where you found this man lying that evening.

A. Yes, sir; I did.

Q. What was the condition of the ground there at that place.

A. It was icy.

Q. State if there was any ice projecting up there.

A. Yes; two or three feet from there was ice where the wagons ran along and pushed the snow up; after it had been thawed it froze. There was a little pile of curded blood where I picked him up.

Q. What was the nature of this ice?

A. It was just regular hard ice.

Q. Did it come up above the regular surface?

A. Yes, sir; stuck up about an inch and a half or two inches, pretty near sharp.

Q. How far was that from where his head was where you found him?

A. Right where this sharp ice was and his head it was two or three inches; there was some curded blood, kind of foamy.

Q. Did you notice blood on the platform?

A. Yes, sir.

This testimony as to the ice is corroborated by the village marshal, and there is no contradictory testimony. The wound was on the front part of the head, and is described by Dr. Wade, the physician who attended him, as follows:

A. We discovered this wound, about as I said, maybe three or four inches, perhaps not quite so much, gaping on account of the fact that the tissues that were about it, you might call flesh, were pushed and the tissues widening it, and in pressing down onto the bone we discovered that there was a small crack in the upper bone. The skull consists of two bones; the lower one of course we could tell nothing about; the upper one, there was a small depression in it.

Q. How could you tell that?

A. By pressing down on the bone and finding an irregularity.

Q. You found that?

A. Yes, sir.

Q. What would that indicate?

A. That something had happened to him pretty severe.

Q. What would you say from that examination was the character of the instrument used in producing that wound?

A. Well, it could be produced a good many ways. When I got there I knew nothing about the matter, until in the morning when I inquired.

Q. What was it with reference to its being a sharp or blunt instrument?

A. I stated at that time, and will state now, that he had received a blow with an instrument that was inclined to be dull. A dull instrument could have done it as easily as a sharp instrument.

Q. You examined that wound pretty carefully that morning?

A. Yes, sir.

Q. What was the size of that wound with reference to the back of the ax identified by the witness H. C. Alderman, that part of it (indicating); what was the size of the wound with reference to that?

A. Of course I could not swear that instrument had done it; it could have happened or been done with an instrument of that kind.

Q. About how long was the wound?

A. Well, I said between three and four inches. I didn't measure it at that time.

Q. About how wide?

A. It was about an inch wide, gaping, as I said. Of course a wound of that kind could be produced with a very blunt instrument. You could take any kind of an iron ball and strike a man and it would produce that kind of a wound.

Q. Could it have been produced by the axe identified by the witness (H. C. Alderman)?

A. I say, it could have been produced by most any kind of a blunt instrument.

The injury is shown to have occurred after the depot was closed and the axe was locked therein, and it is evident that the injury could not have been inflicted with the axe. Each of the defendants below testified as a witness and denied, fully and unequivocally, striking Alderman with an axe or any other instrument. A little blood was found on the platform, but that is accounted for in a variety of ways that need not be noticed here. Aside from vague and indefinite theories upon which this cause seems to have been tried the testimony seems to show that Alderman was intoxicated and fell off the depot platform, which was from two feet to two feet and a half above the ground, striking his head on the sharp ice and cutting his head in the manner indicated. It is a matter of surprise that a court would sustain a verdict of guilty on such testimony. Guilt is not to be established by mere conjecture

or suspicion, however strong.  All experience has shown that a party may be wholly innocent of the offense of which he is accused, although appearances may be against him. The law, therefore, to guard against injustice requires, that the offense be established by evidence beyond a reasonable doubt.   It is a serious matter, not only to a party, but to the state as well, to take a person from the ordinary avocations of life, brand him as a felon and deprive him of his liberty, appropriate his labor and cast a cloud upon his future life and humiliate his relatives and friends; and to authorize the state in doing this there should be no reasonable doubt of his guilt.   The proof in this case falls far short of showing such guilt.   Some of the instructions are open to objection, but it is unnecessary to consider the same.   The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.